Bernard L. ALPERT, Regional Director of the First Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,

v.

LOCAL 1066, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, INDEPENDENT, and its business agent Joseph F. Walsh, and International Longshoremen's Association and its vice-president, Daniel J. Donovan.

Civ. A. No. 58–919.

United States District Court
D. Massachusetts.

Sept. 19, 1958.

Robert E. Greene, NLRB, Boston, Mass., Allen R. DeLong, NLRB, Washington, D. C., for plaintiff.

Joseph T. Doyle, McCormack & Doyle, Boston, Mass., for Local 1066 I.L.A. Independent and Walsh.

George P. Donovan, East Boston, Mass., for Donovan.

John F. Groden, Withington, Cross, Park & McCann, Boston, Mass., for Terminal Operators.

ALDRICH, District Judge.

This is a petition brought by the Regional Director of the N.L.R.B. for a temporary injunction pending a Board hearing on a complaint of unfair labor practice by the respondents. The charging party is Terminal Operators, Inc., hereinafter called Terminal. The respondents are duly constituted labor organizations and their representatives. The matters relate to this District.

Terminal is a lessee of the Army Pier, so-called, in South Boston, under lease from the Commonwealth, which, in turn, leases it from the Federal Government. Terminal is engaged in the operation of the pier for the unloading and loading of vessels, and for storage purposes. This is a sizable enterprise, substantially affecting commerce.

Ships coming to the Army Pier are generally under the temporary management of a local shipping agent, who, in turn, hires stevedores and others to do the unloading of cargo and delivering to the consignees, including the attendant paper work. General checking and other supervision, and the paper work, are performed by clerks. Respondent Local 1066 has a contract with all shipping agents in Boston to supply the

clerks, who are members of the union. The clerks become employees of the agent, and not of Terminal.

The building at the North Pier operated by Terminal has three floors. The first is used exclusively for loading and unloading; the third for storage. The second is usable for either. Respondents do not want it used for storage. They believe that if it is so used there will be less activity at the pier in which their members will be employed. On this they may or may not be correct, but even their own evidence did not indicate any immediate basis for their fear. Terminal believes its proposed use of the second floor will not reduce shipping, and that present shippers will be more cheaply and better served if shipments can be warehoused from time to time on that floor. Terminal further asserts that the pier is leased to it; that the lease permits storage on the second floor, and that respondents have no legal part or concern in what decision it makes. Respondents contend otherwise. On the evidence presented I am unable to see any legal basis for their position.

As a result of this difference of opinion respondents have induced the clerks to refuse to process goods destined for storage on the second floor, and as, seemingly, Terminal cannot obtain possession of the goods without such processing, they cannot be stored there. Terminal has countered by ceasing to solicit shipments which will result in storage on either floor, although the space on the third floor is not presently fully occupied. I find it was as over-precipitate in doing this as respondents were in their behavior. In other words, respondents acted with respect to the second floor before there was any actual danger of losing traffic, and Terminal countered by taking retaliatory steps, reducing the amount of work available for clerks, even when there was still space. I believe that Terminal, not unnaturally, resented respondents' attempt to dictate its managerial policies, and sought immediate economic reprisal. It then brought the present charge, with the hope of obtaining injunctive assistance.

Petitioner asserts that respondents' actions amount to a secondary boycott within the meaning of Section 8(b), subsection (4)(A), 29 U.S.C.A. § 158(b)(4)(A). The charge filed by Terminal reads on that provision, and stated as follows:

"Since on or about August 18, 1958, the above-named labor organizations and individuals have engaged in and induced the employees of Furness-Withy Co. to engage in a concerted refusal to work in the course of their normal employment with the object thereof being to force or require Furness-Withy Co. and Renault to cease doing business with Terminal Operators, Inc."

Furness-Withy Co. is the particular shipping agent who was the employer of respondents' members at the time the dispute crystallized. Renault is the owner and shipper of the cargo then involved, and, incidentally, a presently potential shipper whose further goods, I find, are being diverted to other ports as a result of the continuing controversy.

While the local admits otherwise in its answer, the International union claims that the controversy is with Furness-Withy, not Terminal. It is clear that they are wrong in this. True, the men have refused to do certain work for Furness-Withy, but they have done so simply as a move in a dispute with Terminal. They have also made representations to the stevedores who transport the goods. Furness-Withy has nothing to do with the operation of the pier, what is stored there, or where. What respondents are seeking are changed conditions at Terminal which would result, they believe, in more work for Furness-Withy and other shipping agents, and, in consequence, for themselves. It may be admitted that if a union were to strike its employer because it did not approve of handling certain types of goods, no matter what the reason was, it would lead to the cessation of business between the manufacturer of the goods and the em-

ployer. If this cessation were the incidental result of a primary dispute with the employer it would not be a secondary boycott. But in the case at bar the union is refusing to work on certain goods as part of a direct move against the third party, the person with whom the dispute really lies. The test is one of purpose, not effect.

■ There are further questions. In the ordinary secondary boycott situation the persons in controversy with A, in order to put pressure on A, seek to induce B, against his will rather than by acceptable persuasion, to cease doing business with A. In the case at bar respondents' object was not the cessation of all business, but only of certain business. That does not seem a material distinction. Secondly, it might be argued that respondents were not seeking to stop business at all—that their concern was simply with how it was conducted.[1] However, the means that they adopted was to effect an interruption of certain business relations until their demands were met. Nor do I think it an answer to say that Terminal could have put an end to the severance, at least until the third floor became filled, by acceding to respondents' demands. In most secondary boycotts the principal party with whom the union is in controversy can always end it by acceding to the demands. The present case is worse, because once the third floor became full Terminal would not even have that power.

■■ The purpose of the secondary boycott provision of the Act is to protect parties not desiring to concern themselves with the affray from being drawn in and used as unwilling pawns. Here there was a partial strike against Furness-Withy, leading to a turning away of Renault's shipping business, because Renault wanted storage as well as unloading, in order that by this interruption of business Terminal might be persuaded to the union's point of view with relation to the storage of goods on which its members worked.

While this does not fall within the classical secondary boycott situation, I believe doubts should be resolved in favor of petitioner, pending a full hearing by the Board, and a final legal determination by the Court of Appeals. There is no evidence that Terminal's storage policy to which respondents object would consume enough space to require any present turning away of shipping. On the other hand shipping is being lost as a result of respondents' conduct. I find that petitioner has reasonable grounds to believe that an unfair labor practice exists, and that the public interest requires the issuance of an injunction.

---

1. This argument would be possible only when there was still available space on the third floor to which storage business might be shifted. After that space was consumed it would not be possible for Terminal to take such business at all and still satisfy respondents.